[No. B118321. Second Dist., Div. Seven. Jan. 11, 1999.]

YVONNE KIBBEE, Plaintiff and Appellant, v.
BLUE RIDGE INSURANCE COMPANY et al., Defendants and
Respondents.

54

**COUNSEL**

Kussman & Whitehill, Michael H. Whitehill and Steven G. Mehta for Plaintiff and Appellant.

Gilbert, Kelly, Crowley & Jennett and Peter J. Godfrey for Defendants and Respondents.

**OPINION**

**JOHNSON, J.**—The question to be decided in this case is whether six-year-old Jackson Kibbee was a "resident" of his stepmother's household when he drowned off the shore of Cabo San Lucas, Mexico. The trial court concluded from the undisputed facts that Jackson was a resident of Yvonne Kibbee's household and therefore, under the "resident relative" coverage exception, defendants Blue Ridge Insurance Company and Republic Insurance Company (collectively referred to as Blue Ridge) had no duty to defend or

indemnify her in a negligence action brought by Jackson's mother and older brother. We reach the opposite conclusion and reverse.

FACTS AND PROCEEDINGS BELOW

The following facts are undisputed.

Lincoln Kibbee married plaintiff Yvonne Kibbee in May 1994.[1] They purchased a home in West Hills and obtained a homeowners insurance policy from defendant Blue Ridge Insurance Company.

Lincoln had two sons from a previous marriage, Daniel and Jackson. The custody order provided Lincoln and his former wife, Carol, would share the physical care of the children and their "primary residence shall be with [Carol] and secondary residence shall be with [Lincoln]." This custody order was subsequently modified in January 1994 to add a provision that the boys would live with each parent for alternating seven-day periods. All other provisions of the original custody order remained in effect. During the seven-day periods Lincoln had custody of the boys they lived with him and their stepmother, Yvonne, in their home in West Hills.

At Lincoln's West Hills home, the children had their own bedroom where they kept clothing and toys. They received mail there, such as birthday party invitations. Lincoln and Yvonne drove the boys to school and to after-school activities such as soccer and karate.

Lincoln and Carol followed the alternating seven-day plan from January 1994 until May 1995 when Lincoln's work required him to move to Cabo San Lucas, Mexico.

A screenwriter, Lincoln was named story editor of an American television series filming in Cabo San Lucas. This assignment required him to live full-time in Mexico until shooting of all the show's episodes was completed. No one knew how long production would last and the completion schedule was constantly being moved back. Moreover, it was possible shooting would continue year-round in Mexico if the series was renewed. Facing an indefinite stay in Mexico, Lincoln and Yvonne moved out of the hotel they had been occupying and rented a house in June 1995. They moved most of their belongings from their West Hills house to their house in Mexico, including their car, computer, television, VCR, clothing, jewelry, some furniture, office supplies and the family dog. They did not bring with them, however, any items for Daniel and Jackson such as clothing, toys or furniture because it was not their intent the boys would reside with them in Mexico.

---

[1] Hereafter we will refer to members of the Kibbee family by their first names.

Carol initially refused to allow the children to visit their father in Mexico. Through mediation, Carol and Lincoln signed an agreement providing the boys could travel to Cabo San Lucas and stay with Lincoln and Yvonne for a two-week period from July 29, 1995, to August 12, 1995. The agreement specified "all previous [custody] orders shall remain in full force and effect . . . ." The agreement also provided Lincoln "shall appear for court on August 9, 1995." He would never make that appearance.

The children arrived in Cabo San Lucas on the scheduled day to begin their two-week stay with their father and stepmother. They brought with them clothing, toys and videos from their mother's home in California. Unlike the arrangement in West Hills, the boys did not have a room of their own in Cabo San Lucas. Instead they slept in the same room with Lincoln and Yvonne.

On August 9, shortly before their two-week stay was to end, Lincoln took his sons down to the beach to play. A large wave hit the shore and as the water retreated it pulled both boys with it into the ocean. A bystander managed to pull eight-year-old Daniel to safety, but six-year-old Jackson was washed out to sea. In an effort to save his son, Lincoln dived into the ocean but drowned with Jackson in the turbulent water.

A month later, Carol sued Yvonne for the wrongful death of her son alleging Yvonne was negligent in her supervision of the children. Daniel also sued Yvonne for negligence based on his physical injuries and emotional distress. Yvonne tendered defense of the action to Blue Ridge under her homeowners policy. Blue Ridge denied coverage and refused to defend Yvonne on the ground Jackson was a resident of her household at the time of his death and thus an insured under the policy. The policy excludes liability coverage for bodily injury to an "insured."

Yvonne retained counsel to represent her in the action by Carol and Daniel. The action was eventually dismissed but not until Yvonne incurred approximately $50,000 in attorney fees.

In the present action, Yvonne is suing Blue Ridge for breach of contract for its refusal to defend her in the underlying lawsuit brought by Carol and Daniel. The trial court granted summary judgment to Blue Ridge on the grounds there were no triable issues of material fact and Blue Ridge was entitled to judgment as a matter of law. The court concluded at the time of the accident Jackson and Daniel were "residents" of Yvonne's household and therefore "insureds" under the policy's "resident relative" exclusion.

Judgment was subsequently entered for Blue Ridge and Yvonne filed a timely appeal. We reverse.

## DISCUSSION

We agree with the trial court this case is ripe for summary judgment. Neither side contends there are material issues of fact requiring resolution at trial. The only dispute is over the proper legal rule to be applied to the undisputed facts. (Cf. *National Auto. & Cas. Ins. Co.* v. *Underwood* (1992) 9 Cal.App.4th 31, 36-37 [11 Cal.Rptr.2d 316].)

The policy at issue in this case provides standard liability coverage for a claim made or a suit brought against an insured "for damages because of a bodily injury . . ." The policy, however, specifically excludes coverage for "bodily injury to . . . an insured." An "insured" is defined as "you and residents of your household who are (a) your relatives or (b) other persons under the age of 21 and in the care of any person named above."

The term "resident" is not defined in the policy. Two Court of Appeal decisions have interpreted the resident relative exclusion in the context of children of divorced parents and have reached different conclusions as to its applicability.

In *Safeco Ins. Co.* v. *Gibson* (1989) 211 Cal.App.3d 176 [259 Cal.Rptr. 206] (hereafter *Gibson*), a child was killed while riding in a car driven by his divorced father. The mother sued the father for wrongful death and the father's insurance company denied coverage under the resident relative exclusion on the ground the child was a resident of the father's household. The trial court granted summary judgment to the insurance company on its action for declaratory relief and the Court of Appeal affirmed.

The Gibson's judgment of dissolution specified the child's "primary place of residence" was with the mother but provided the parents would share physical custody—the father having custody of the child from Sunday evening until Wednesday morning and the mother having custody from Wednesday morning until Sunday evening. The parents adhered to this schedule until the child's death. In addition to showing the child spent a substantially equal amount of time in the household of each parent, the evidence showed the child had his own room at his father's house where he received mail and kept a separate array of clothing and toys.

The majority opinion in *Gibson* rejected the father's claim under the facts of this particular case the term "resident" was ambiguous. (211 Cal.App.3d

at pp. 183-184.) After reviewing cases which had applied the term in other insurance contexts, the court concluded, "the common thread that runs through each of these cases is not whether the terms 'residence' or 'member of the household' are themselves inherently ambiguous, but whether, under the particular facts of each of those cases, insurance coverage was extended or excluded under the terms of the policy in question." (*Id.* at p. 181.) Looking to the terms of the custody order, the parents' actual practice of sharing custody on an equal-time basis, and the provisions of Government Code section 244 and Welfare and Institutions Code section 17.1[2] the court concluded the term "resident" could have only one reasonable construction when applied to the joint custody setting of this case. The child should be viewed as having "dual residences"—one with his mother and the other with his father. (211 Cal.App.3d at p. 184.) Based on this conclusion, neither parent would be covered in a suit by the child for bodily injury therefore, the court explained, ". . . where the child is physically located at a given point or period of time is not significant." (*Ibid.*) The *Gibson* majority rejected the dissent's argument the term "resident" was ambiguous because the child could have a primary residence and a secondary residence. (211 Cal.App.3d at p. 186.) In the majority's estimation: "To conclude on these facts [the child] had a primary and a secondary residence would be to exalt form over substance." (*Id.* at p. 184.)

In summing up its opinion the *Gibson* majority made a statement which seems to contradict its earlier analysis and conclusion. The court stated: "At the date of the tragic accident which took Sean's life, he was living with his father in accordance with the custody order. Therefore, at that point in time he was a resident of his father's household. As such, Sean came within the family exclusion clause contained in the father's Safeco insurance policy." (211 Cal.App.3d at p. 184.) This statement appears contrary to the court's finding the child had a "dual residency" based on the fact the child spent a substantially equal amount of time in the household of each parent. The court seems to suggest the minor child of divorced parents is a resident of the household in which the child is physically located at the time of the accident regardless of the percentage of time the child actually spends in that household. (We discuss this issue further below.)

---

[2]Welfare and Institutions Code section 17.1, subdivision (a) provides: "The residence of the parent with whom a child maintains his or her place of abode . . . determines the residence of the child." Government Code section 244 provides: "In determining the place of residence the following rules shall be observed: [¶] . . . [¶] (d) The residence of the parent with whom an unmarried minor child maintains his or her place of abode is the residence of such unmarried minor child." In *Bluehawk* v. *Continental Ins. Co.* (1996) 50 Cal.App.4th 1126, 1132 [58 Cal.Rptr.2d 147], involving the residence of the adult son of the insured, the court criticized *Gibson* for using section 244 to interpret an insurance contract, noting that section concerns political rights and therefore bears no relationship to the contractual meaning of the term "resident."

In *National Auto. & Cas. Ins. Co.* v. *Underwood, supra*, 9 Cal.App.4th 31, two children were injured while riding in a car driven by their divorced mother. The father sued the mother for negligence on the children's behalf and the mother's insurance company denied coverage under the resident relative exclusion on the ground the children were residents of the mother's household. The insurance company brought an action against the mother for declaratory relief on the coverage issue. On cross-motions for summary judgment the trial court ruled in favor of the mother and the Court of Appeal affirmed.

The Underwood's custody agreement designated the father as the children's "primary caretaker." The children lived with their father the majority of the time. They stayed with their mother every other weekend, alternate Thanksgivings, half their Christmas and Easter vacations and for 10 weeks during the summer. At the time of the accident, the children were on Easter vacation and living with their mother pursuant to the custody agreement. At their mother's home the children slept in a separate bedroom, which was also used for storage. They kept some clothes and toys at their mother's home.

The court in *Underwood* concluded ". . . the term 'resident' used in the exclusion clause at issue here is capable of at least two reasonable constructions when applied to the joint custody setting of this case." (9 Cal.App.4th at p. 39.)

One reasonable construction, the court stated, was that the children had a single residence with their father based on the undisputed evidence they spent far more time with him than with their mother, attended school while maintaining their residency in the father's household and the father was designated in the custody agreement as the "primary caretaker." It would also be reasonable, the court acknowledged, to construe the term "resident" to mean the household where the children were physically residing at the time of the accident, which was with their mother. A third reasonable construction, the court said, would be that the children had dual residences at the time of the accident—one with the mother and one with the father. (9 Cal.App.4th at p. 40.) Given three reasonable interpretations of the term "resident" under the circumstances of this particular case the court followed the well-established rule that the term should be construed in favor of the policy holder. Accordingly, the court held, ". . . we adopt the interpretation that the children were not residents of [the mother's] household at the time of the accident. If children of a divorced insured are to be excluded under the policy in the same fashion as children of an intact family under one roof, the insurer should make that clear in its policy. The fact is this case exemplifies a common joint custody arrangement of school-age children who spend

vastly different amounts of time at each parent's house. Lacking a more explicit definition of 'resident,' an insurer must accept liability under any reasonable interpretation of the words it uses. . . ." (*Id.* at p. 41, citations omitted.)

The *Underwood* court distinguished *Gibson* on its facts noting the *Gibson* majority "based its decision on the fact the boy spent 'a substantially equal amount of time' with his father and mother." (9 Cal.App.4th at p. 41.) In contrast, the Underwoods' children did not spend an equal amount of time with each parent. "They spent the vast majority of their time with [their father]. And this is a distinction with a difference given the [*Gibson*] court's justified emphasis on this fact when considering the issue of residency." (*Ibid.*, citing *Gibson, supra,* 211 Cal.App.3d at pp. 178, 184.)

In the present case, Blue Ridge argues *Gibson* established a bright-line test for determining the residency of a minor child of divorced parents: the child is a resident of the household in which he or she is physically located at the time of the accident. (See *Gibson, supra,* 211 Cal.App.3d at p. 184.) Although the *Gibson* court made a statement which, taken out of context, lends support to Blue Ridge's argument (see discussion, *ante,* pp. 58-59), we do not believe the court intended to declare such a rule, but even if it did we would decline to follow it for the reasons explained below.

Our principal reason for rejecting a rule declaring a minor child of separated or divorced parents to be a resident of whichever parent's household he or she is living in at a particular point in time is that it is arbitrary and fails to take into account the particular facts of the case. In reaching its conclusion the Gibsons' son had "dual residences," the court relied heavily on the evidence showing how the parents actually behaved with respect to sharing custody of the child observing the parents faithfully complied with the time-sharing provisions of the order so that the child spent a substantially equal amount of time in the household of each parent. (211 Cal.App.3d at p. 184.) A test for residency which focuses exclusively on where the child is living at the time of the accident ignores the kind of facts the *Gibson* court found most significant.

Furthermore, despite its closing comment, we do not believe the *Gibson* court intended to hold as a matter of law the minor child of separated or divorced parents is a resident of whichever household he or she happens to be living in at the time of the accident. Earlier in its opinion the court had explained why a custody order was not determinative of the child's residence. "It would be ludicrous," the court asserted, "to find that a minor is the resident of the household of a parent who is awarded physical custody if, in

fact, the minor lives with the other parent all or most of the time." (211 Cal.App.3d at p. 182.) We find it difficult to believe the court intended to establish a test for residency which would lead to the result it had just declared "ludicrous." Yet the bright-line test Blue Ridge urges us to recognize or adopt could have precisely the "ludicrous" consequence identified in *Gibson* if the child was deemed a resident of the parent's household in which he or she was living at the time of the accident even though the child lived with the other parent the vast majority of the time.

Yvonne, on the other hand, argues this case is indistinguishable from *Underwood* and should produce the same result. The children in this case, like the Underwood children, spent the majority of their time with one parent. Indeed, the children in the present case had lived exclusively with Carol from May until the end of July when they began their two-week visit with their father. Thus, the Kibbee children spent even less time with their father than the Underwood children spent with their mother. The *Underwood* court held the term "resident" was ambiguous under these circumstances and therefore construed the term in favor of the parent with whom the children spent the least amount of time. Likewise, Yvonne argues, we should construe the term "resident" in her favor and hold the children were at all relevant times residents of Carol's household, the parent with whom they lived exclusively.

We agree the children in this case were residents of Carol's household at the time of the accident, but not for the reasons advanced by Yvonne. Although the term "resident" may not have an absolute meaning (*Cal-Farm Ins. Co.* v. *Boisseranc* (1957) 151 Cal.App.2d 775, 781 [312 P.2d 401]), it has a commonly accepted meaning so that its use in the resident relative exclusion is not inherently ambiguous. Accordingly, we believe the children's residency can be determined by applying the facts and circumstances of this case to the commonly accepted meaning of the terms "resident" and "residence." (*Utley* v. *Allstate Ins. Co.* (1993) 19 Cal.App.4th 815, 821 [24 Cal.Rptr.2d 1] [words used in an insurance policy are interpreted according to the plain meaning a layperson would ordinarily attach to them].)

California courts are in agreement the term "residence" " 'connotes any factual place of abode of some permanency, more than a mere temporary sojourn[.]' " (*Utley* v. *Allstate Ins. Co., supra,* 19 Cal.App.4th at p. 820, citing *Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497]; accord, *Bullock* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1097 [271 Cal.Rptr. 44]; *Vanguard Ins. Co.* v. *Hartford Ins. Co.* (1970) 9 Cal.App.3d 765, 768 [88 Cal.Rptr. 628].) This understanding is consistent with dictionary definitions of the term "resident" as one " 'who dwells in a

place for a period of some duration' " and "residence" as " 'a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit.' " (Webster's New Internat. Dict. (3d ed. 1961) p. 1931, quoted in *Hardware Mutual Casualty Co.* v. *Home Indemnity Co.* (1966) 241 Cal.App.2d 303, 311 [50 Cal.Rptr. 508].)

While there is no bright-line test for determining a child's residency when the parents are divorced, the usual rules of contract interpretation and the common understanding of the terms "resident" and "residence" provide clear direction as to the factual inquiry a court must undertake in determining the applicability of the resident relative exclusion: The Washington Court of Appeal framed the inquiry as follows: "Does the child regularly spend time in the household in question, such that there exists a continuing expectation of the child's periodic return on intervals regular enough that the household is the child's home during the time the child is there, as opposed to a place of infrequent and irregular visits[]" (*Estate of Adams* v. *Great Amer. Ins. Cos.* (1997) 87 Wn.App. 883 [942 P.2d 1087, 1091].)

Prior to Lincoln's move to Cabo San Lucas there could have been no doubt Daniel and Jackson were residents of Lincoln's household. Indeed, in *Gibson*'s words the boys had "dual residences"—one with Lincoln and one with Carol. The time they spent in each household was substantially equal. Whichever parent's household they resided in at a given point in time it was known and accepted they would return to the other parent's household within seven days. There were no exceptions contemplated to this schedule and none occurred so far as the record shows. (Cf. *Gibson, supra*, 211 Cal.App.3d at p. 184.) Moreover, the boys maintained clothing, toys and other boyhood necessities at both homes and engaged in the same activities, (going to school, attending soccer practice, taking karate lessons), regardless of which household they were living in. It would have been impossible then to have said the boys were residents of Lincoln's household anymore than of Carol's.

When Lincoln moved to Cabo San Lucas for an indefinite time the boys' circumstances changed significantly. They no longer spent every other seven-day period with their father. They did not see him at all from the time he relocated to Mexico in May until they came for a two-week visit at the end of July and then only after Carol's initial refusal to allow them to make the trip and her reluctant agreement to allow them to come for the two weeks. Clearly, this visit to Mexico did not signal the resumption of the seven-day time-sharing arrangement. The boys' trip to Mexico was for two weeks not seven days and there was no agreement between Carol and

Lincoln as to any future visits. The boys brought with them only the clothing and toys they needed for the two-week period. Furthermore it is obvious that so long as Lincoln lived in Mexico the seven-day time share was impractical during the summer and totally out of the question once school started in the fall. Finally, we note that in its summary judgment motion Blue Ridge admitted "the Kibbee children were vacationing in Cabo San Lucas at the time of the incident." The conclusion is inescapable that while staying with Lincoln in Mexico the boys were on a "mere temporary sojourn."

For the reasons stated above, we hold Daniel and Jackson were not residents of Lincoln's and Yvonne's household at the time of the accident and therefore the resident relative exclusion in their homeowners policy does not bar coverage for the suit filed against Yvonne by Carol and Daniel.

### DISPOSITION

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. Appellant is awarded costs on appeal.

Lillie, P. J., and Neal, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 21, 1999.