Filed 6/17/14  Peet v. State Farm General Ins. Co. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| EDDLEE PEET,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>STATE FARM GENERAL INSURANCE COMPANY,<br><br>     Defendant and Respondent. | H039796<br>(Monterey County<br> Super. Ct. No. M102871) |

## I.     INTRODUCTION

Plaintiff Eddlee Peet obtained a wrongful death judgment against his brother-in-law, Mark Doyle, who had caused the death of plaintiff's two-year-old son, Anthony.  At the time of Anthony's death, plaintiff and Anthony's mother were both incarcerated, and Anthony was living at Doyle's residence.

After obtaining the wrongful death judgment against Doyle, plaintiff sought recovery from State Farm General Insurance Company (State Farm), which had provided Doyle with a homeowner's insurance policy at the time of Anthony's death.  Citing the insurance policy's resident relative exclusion provision, State Farm denied coverage for Anthony's death.

Plaintiff then filed a complaint against State Farm, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. State Farm subsequently moved for summary judgment, arguing that as a matter of law Anthony's death was not covered because of the resident relative exclusion provision of the insurance policy. The trial court granted summary judgment in favor of State Farm.

On appeal, plaintiff's primary contention is that the trial court erred by finding that the resident relative exclusion provision applied to Anthony and thus that State Farm was entitled to summary judgment. Plaintiff further contends the trial court erred by finding that State Farm did not act in bad faith or with malice or oppression, and he claims the trial court should have addressed the issue of his right to sue State Farm for prejudgment claim handling.

For reasons stated below, we determine that the undisputed evidence established that Anthony was a resident of Doyle's household at the time of his death and that therefore, State Farm was not obligated to provide insurance coverage under the terms of the policy. We further determine that the undisputed evidence established that State Farm did not act in bad faith or with malice or oppression. Thus, we will affirm the judgment.

## II.    BACKGROUND

Anthony Cardinale-Peet was the son of plaintiff and Joselyn Cardinale.[1] Sometime around July of 2002, Joselyn kicked plaintiff out of her house. At the time, Joselyn had a restraining order against plaintiff. For the next few months, Anthony lived exclusively with Joselyn, although no custody order was ever issued.

---

[1] Several of the people involved in this case are related and share similar names. We will refer to some people by their first names for clarity.

At the time of the relevant events, Joselyn's sister, Maria Cardinale-Doyle, was married to Mark Doyle.[2] Doyle had a number of health problems, and he took a variety of prescription medications. According to Maria, Anthony spent a great deal of time at the Doyles' household. From February 2002 through May 2002, Anthony stayed with the Doyles approximately one night per week. According to Joselyn, however, she only left Anthony with the Doyles once.

### A.    *Anthony Begins Living With the Doyles*

In late October of 2002, Anthony was living with Joselyn at a house owned by her parents. On or about October 26, 2002, Joselyn was arrested. Plaintiff was present during the arrest. Joselyn told plaintiff to take Anthony and not give him "to nobody."[3] Plaintiff packed some of Anthony's clothes and took Anthony to stay with him at the home of Joyce Peet, who was plaintiff's mother and Anthony's grandmother. In preparing to have Anthony stay with him and his mother, plaintiff packed "a few things" for "a few nights." (Underscoring omitted.) At Joyce's house, Anthony slept on a couch.

On the day after Joselyn's arrest, the Doyles took Anthony to spend time with them, with plaintiff's permission. During the visit, Maria observed bruises on Anthony's body and a lump on his head. The next week, the Doyles asked if Anthony could spend the weekend with them. Plaintiff agreed. However, the Doyles failed to bring Anthony back to plaintiff after the weekend.

Plaintiff did not contact the police or take other legal action to require the Doyles to return Anthony to him. On or about November 16, 2002, plaintiff was arrested for violating the restraining order after going to see Joselyn in jail. During the months

---

[2] Maria Cardinale-Doyle and Mark Doyle divorced at some point after Anthony's death. By the time she filed a declaration in the instant action in 2012, Maria had remarried and went by the name Maria Cardinale-Martorella.

[3] Joselyn's other son, Devon, was also present at the time of her arrest. Joselyn told plaintiff to call Devon's father so he could "get Devon."

following plaintiff's arrest, Joyce Peet did not seek Anthony's return from the Doyles. Joyce felt that plaintiff and Joselyn "could take care of that" after they were released from jail.

At the Doyles' home, Anthony had his own bed in a bedroom that he shared with the Doyles' sons. He had his own playpen and toys there. The Doyles provided Anthony with food, clothing, and baths. They were Anthony's sole financial support and considered him a part of their household. On December 1, 2002, Maria took Anthony for medical treatment of a possible ear infection. The Doyles brought Anthony to visit Joselyn in jail twice, and they brought him to court for Joselyn's sentencing hearing on December 6, 2002.

Joselyn and plaintiff planned to leave Anthony with the Doyles until one of them was out of jail. They had an understanding that "whoever got out first was going to get Anthony." (Underscoring omitted.) They both remained incarcerated through January of 2003.

### B.    Anthony's Death

On the morning of January 10, 2003, Doyle and Anthony fell asleep on a bed. Maria spoke to Doyle at about 11:45 a.m. and then drove home. She arrived home at about 12:05 p.m. and saw Doyle and Anthony on the bed. Anthony was lying on his back, with a pillow over his face. Doyle's arm was across the pillow. When Maria moved the pillow, she realized that Anthony was not breathing. She screamed. Doyle woke up and realized he had rolled on top of Anthony. Maria called 9-1-1. Emergency personnel responded and treated Anthony, then transported him to a hospital, where he was pronounced dead. Anthony's autopsy revealed that his death was consistent with asphyxiation.

Doyle told the police that he had been suffering from sleep apnea and that he had difficulty staying awake. While being interviewed in the hospital, Doyle dozed off twice. Doyle appeared medicated, and he tested positive for eight drugs, all of which were on

4

his prescribed medication list.  His blood test did not reveal the presence of any drug at a "high level."

Joselyn was interviewed by the police following Anthony's death.  Joselyn indicated she had been worried about Anthony staying with the Doyles because of the amount of medications that Doyle took.  However, she acknowledged that she had not done anything to stop Anthony from staying with the Doyles.

Plaintiff told the police that the Doyles had kept Anthony after taking him for a second visit.  Plaintiff said "this was alright with him, that he wanted to be the nice guy, and that he went into custody anyway."

The police referred the case to the District Attorney for possible prosecution of the Doyles for willful cruelty to a child under Penal Code section 273a, subdivision (a).  However, the District Attorney declined to prosecute.

### C. *The Insurance Policy and Claim Investigation*

At the time of Anthony's death, Doyle had a homeowner's insurance policy through State Farm.  The policy defined " 'insured' " as "you and, if residents of your household:  [¶] a. your relatives; and [¶] b.  any other person under the age of 21 who is in the care of a person described above."  The policy excluded coverage for "bodily injury to you or any insured within the meaning of part a. or b. of the definition of insured."  (Emphasis omitted.)

In April of 2003, plaintiff notified State Farm, through an attorney, that he intended to file a claim against the Doyles.  State Farm claims representative Stephanie Pastor was assigned to investigate the claim.

Pastor first spoke with Maria Cardinale-Doyle, who stated that she and her husband had been "taking care" of Anthony at the time of his death, while Anthony's mother was incarcerated.  Pastor also met with the Doyles, who stated that they had picked up Anthony for a visit and decided not to bring him back to plaintiff after observing bruises on his body.  The Doyles stated that they believed they had permission

5

to keep Anthony because Mark Doyle had visited Joselyn in jail and obtained her written permission. The Doyles described Anthony's sleeping arrangements. Pastor subsequently reviewed police reports regarding Anthony's death. Based on the police reports and her conversations with the Doyles, she recommended that State Farm deny coverage based on the resident relative exclusion provision of the Doyles' policy. State Farm notified plaintiff, through his attorney, of that decision.

In May of 2006, plaintiff contacted State Farm again, through a new attorney, notifying State Farm that he had filed a wrongful death action against Mark Doyle on April 16, 2004. Plaintiff requested information about the Doyles' homeowners' insurance policy. State Farm asked plaintiff's attorney to submit evidence demonstrating that Anthony was not a resident of the Doyles' household at the time of his death. Plaintiff's attorney sent State Farm a number of documents authored by plaintiff, Joselyn, and plaintiff's mother, all describing their intent that Anthony not continue residing at the Doyles' home. State Farm reviewed the documents and then reiterated its decision to deny coverage.

### D.    Legal Proceedings

On July 23, 2009, plaintiff obtained a default judgment of $750,000 in the wrongful death action against Doyle. Plaintiff subsequently sent a demand letter to State Farm. State Farm reviewed the file again, then informed plaintiff that it still maintained that Doyle's homeowner's policy did not cover Anthony's death.

On December 3, 2009, plaintiff filed a complaint against State Farm, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiff sought to recover as damages the $750,000 judgment, plus costs, attorneys fees, and punitive damages.

State Farm filed a motion for summary judgment, or, in the alternative, summary adjudication, on October 19, 2012. Plaintiff filed opposition to the motion on December

6

28, 2012. At a hearing held on January 18, 2013, the trial court granted summary judgment in favor of State Farm.

In its order granting summary judgment, the trial court found that State Farm had no duty to defend or indemnify Doyle because of the insurance policy's resident relative exclusion clause. The court found that "the objective facts regarding Anthony's physical living arrangements" were undisputed and showed that Anthony resided "exclusively and continuously" with the Doyles from the end of October 2002 until the date of his death. The court held that plaintiff could not establish bad faith since he could not show that State Farm withheld benefits "without proper cause." Finally, the court found that as a matter of law, plaintiff's claim for punitive damages was "without merit" because he could not show that State Farm acted with malice, oppression, or fraud.

## III. DISCUSSION

On appeal, plaintiff's primary contention is that the trial court erred by finding that the resident relative exclusion provision applied to Anthony. Before addressing plaintiff's contention, we will outline the applicable standard of review.

### A. Standard of Review

The standard of review for an order granting a motion for summary judgment is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).)

In performing our independent review, we apply the same three-step process as the trial court. "Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought." (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 (*Baptist*).)

"We then examine the moving party's motion, including the evidence offered in support of the motion." (*Baptist*, *supra*, 143 Cal.App.4th at p. 159.) A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit

because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (o); *Aguilar, supra*, 25 Cal.4th at p. 850.)

If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied.  However, if the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 849; *Kahn v. East Side Union High School Dist*. (2003) 31 Cal.4th 990, 1002-1003.)

In determining whether the parties have met their respective burdens, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citations], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar, supra*, 25 Cal.4th at p. 843.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.)  Thus, a party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.  [Citation.]" (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)

### B.  *Interpretation of Insurance Policies*

The rules on interpretation of insurance agreements are " 'well-established.' " (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1145.)  " 'In general, interpretation of an insurance policy is a question of law and is reviewed de novo under settled rules of contract interpretation.  [Citations.]  "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties.

8

'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' " [Citation.]' [Citation.] [¶] 'An insurance policy provision is ambiguous when it is susceptible of two or more reasonable constructions. [Citation.] If ambiguity exists, however, the courts must construe the provisions in the way the insurer believed the insured understood them at the time the policy was purchased. [Citation.] In addition, if, after the court evaluates the policy's language and context, ambiguities still exist, the court must construe the ambiguous language against the insurer, who wrote the policy and is held " 'responsible' " for the uncertainty. [Citation.]' [Citation.]" (*Id.* at pp. 1145-1146.)

### C.    *Resident Relative Exclusion Clauses*

A number of California cases have considered the meaning of the term "resident" in the context of an insurance policy's resident relative exclusion clause. California courts have held that the term "resident" is not "inherently ambiguous" (*Kibbee v. Blue Ridge Ins. Co.* (1999) 69 Cal.App.4th 53, 61 (*Kibbee*)) although it may be ambiguous in a "particular context" (*National Auto. & Cas. Ins. Co. v. Underwood* (1992) 9 Cal.App.4th 31, 38 (*Underwood*)). The meaning of the term " 'resident' " "varies according to the circumstances and facts of the case." (*Utley v. Allstate Ins. Co.* (1993) 19 Cal.App.4th 815, 821.)

"California courts are in agreement the term 'residence' ' "connotes any factual place of abode of some permanency, more than a mere temporary sojourn [.]" ' [Citations.] This understanding is consistent with dictionary definitions of the term 'resident' as one ' "who dwells in a place for a period of some duration" ' and 'residence'

9

as ' "a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." ' [Citations.]" (*Kibbee, supra,* 69 Cal.App.4th at pp. 61-62.)

Several of the cases interpreting resident relative exclusion clauses have concerned children who were the subject of custody orders. In such cases, "there is no bright-line test for determining a child's residency," but "the usual rules of contract interpretation and the common understanding of the terms 'resident' and 'residence' provide clear direction as to the factual inquiry a court must undertake in determining the applicability of the resident relative exclusion." (*Kibbee, supra,* 69 Cal.App.4th at p. 62.) The determination turns on whether the child regularly spends time in the household in question, " 'such that there exists a continuing expectation of the child's periodic return on intervals regular enough that the household is the child's home during the time the child is there, as opposed to a place of infrequent and irregular visits[.]' [Citation.]" (*Ibid.*)

In *Safeco Ins. Co. v. Gibson* (1989) 211 Cal.App.3d 176 (*Gibson*), the custody order provided for joint legal custody and shared physical custody of the child, but it specified that the child's "primary place of residence" was his mother's home. (*Id.* at p. 178.) The child spent half of each week with each parent, until he died in a car accident. The mother filed a wrongful death action against the father, who had been driving the car. The father's insurance company refused to defend the action because the policy had a resident relative exclusion clause, and it filed a declaratory relief action, then sought summary judgment. The trial court granted summary judgment in favor of the insurance company, finding the child had " 'a dual residence.' " (*Id.* at p. 184.)

On appeal, the *Gibson* court affirmed the grant of summary judgment. The court emphasized that the custody order was not determinative of whether the resident relative exclusion provision of the insurance policy applied. (*Gibson, supra,* 211 Cal.App.3d at p. 181.) The court found it "insignificant whether a decree designates the time a minor

lives with a particular parent as 'custody' or 'visitation,' " and noted that since "parties to a custody decree in practice often deviate substantially from the terms of the decree," "it would be ludicrous to find that a minor is the resident of the household of a parent who is awarded physical custody if, in fact, the minor lives with the other parent all or most of the time. [Citation.]" (*Id.* at p. 182.) Thus, the court concluded, "although [the child] had but one legal residence at a time, where he was then living, in reality and as a practical matter, he had dual residences as the trial court suggested." (*Id.* at p. 184.)

In *Underwood, supra,* 9 Cal.App.4th 31, the parents shared legal and physical custody of their children, but the custody order designated the father as the children's " 'primary caretaker.' " (*Id.* at p. 35.) The children lived with the father during the week and stayed with the mother every other weekend as well as on some holidays and during the summer. At the mother's house, the children stayed in a second bedroom that was also used for storage. While the children were with their mother over their Easter vacation, they were injured in a car accident. The mother's insurance company refused to provide coverage, asserting that the policy's resident relative exclusion clause applied. The trial court disagreed and granted summary judgment against the insurance company.

On appeal, the *Underwood* court found that there were three different reasonable constructions of the term " 'resident' " as used in the insurance policy. (*Underwood, supra,* 9 Cal.App.4th at p. 41.) It was reasonable to find that the children had a single residence, with their father, since they spent "far more time" there. (*Id.* at p. 40.) It was also reasonable to find that the children were residents of their mother's house "at the time of the accident." (*Ibid.*) A third reasonable finding was that the children "had dual residences." (*Ibid.*) Since all three constructions were reasonable, the court held that the policy had to be interpreted in favor of coverage. Thus, the *Underwood* court held that the children were not residents of their mother's household at the time of the accident and affirmed the trial court's grant of summary judgment against the insurance company. (*Id.* at p. 41.)

11

In *Kibbee, supra,* 69 Cal.App.4th 53, a custody order provided that the children "would live with each parent for alternating seven-day periods." (*Id.* at p. 55.) However, after the father moved to Mexico with his new wife, the children lived exclusively with the mother. During a two-week vacation to the father's home in Mexico, one of the children drowned, along with the father. (*Id.* at p. 56.) The mother sought recovery from the father's new wife, who tendered the defense to her homeowner's insurance policy. The insurance company refused to provide coverage based on the policy's resident relative exclusion clause. After the new wife sued the insurance company for breach of contract, the trial court granted summary judgment in favor of the insurance company.

The *Kibbee* court agreed that the children were not residents of the father's household at the time of their visit to Mexico. The court contrasted the visit with the original seven-day time-sharing arrangement. The court found it significant that there were no plans for future visits by the children, and that the children had "brought with them only the clothing and toys they needed for the two-week period." (*Kibbee, supra,* 69 Cal.App.4th at p. 63.) The court held, "The conclusion is inescapable that while staying with [their father] in Mexico the boys were on a 'mere temporary sojourn.' " (*Ibid.*)

The above cases provide guidance as to the factors that determine whether a child is a resident of a particular household in situations where the child also spends time in other households. Contrary to plaintiff's claim, these cases are not inapposite because they involved custody orders. None of the cases turned on the terms of the custody order. In fact, the above cases hold that the terms of a custody order are not determinative of a child's residence and that the actual living arrangement establishes whether a child is a resident of a particular household. (See *Gibson, supra,* 211 Cal.App.3d at p. 182; *Kibbee, supra,* 69 Cal.App.4th at pp. 55, 63.)

Plaintiff contends that rather than use the factors outlined in the above cases, we should apply the guidelines for "determining the place of residence" provided in

12

Government Code section 244.[4]  Plaintiff does not explain how this section supports a determination that Anthony did not reside with the Doyles at the time of his death. Moreover, as observed in *Bluehawk v. Continental Ins. Co.* (1996) 50 Cal.App.4th 1126, the Government Code's "definition of 'residence' has no relationship to the contractual meaning of 'resident' " in a liability policy.  (*Id*. at p. 1132.)

Plaintiff also suggests that we should apply Welfare and Institutions Code section 17.1, subdivisions (a) and (b) in determining Anthony's residence at the time of his death.[5]  Again, plaintiff fails to explain how this statute supports a determination that Anthony did not reside with the Doyles at the time of his death, nor does he provide authority for the claim that this statute applies in the context of a case involving interpretation of an insurance policy.  (See Welf. & Inst. Code, § 5 ["Unless the context otherwise requires, the general provisions hereinafter set forth shall govern the

---

[4] Government Code section 244 provides:  "In determining the place of residence the following rules shall be observed:  [¶]  (a) It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose.  [¶]  (b) There can only be one residence.  [¶]  (c) A residence cannot be lost until another is gained.  [¶]  (d) The residence of the parent with whom an unmarried minor child maintains his or her place of abode is the residence of such unmarried minor child.  [¶]  (e) The residence of an unmarried minor who has a parent living cannot be changed by his or her own act.  [¶]  (f) The residence can be changed only by the union of act and intent.  [¶]  (g) A married person shall have the right to retain his or her legal residence in the State of California notwithstanding the legal residence or domicile of his or her spouse."

[5] Section 17.1 provides in pertinent part that "the residence of a minor person . . . shall be determined by the following rules:  [¶]  (a) The residence of the parent with whom a child maintains his or her place of abode or the residence of any individual who has been appointed legal guardian or the individual who has been given the care or custody by a court of competent jurisdiction, determines the residence of the child.  [¶] (b) Wherever in this section it is provided that the residence of a child is determined by the residence of the person who has custody, 'custody' means the legal right to custody of the child unless that right is held jointly by two or more persons, in which case 'custody' means the physical custody of the child by one of the persons sharing the right to custody."

construction of this code."]; cf. *Gibson, supra,* 211 Cal.App.3d at p. 184 [finding that a child has dual residences does not "conflict with the provisions of . . . Welfare and Institutions Code section 17.1"].)

Thus, in determining whether Anthony was a resident of the Doyles' household at the time of his death within the meaning of the resident relative exclusion clause of Doyle's homeowner's insurance policy, we apply the factors outlined in the cases discussed above. The evidence presented in support of State Farm's motion for summary judgment showed that Anthony " 'regularly spen[t] time in the household in question.' " (*Kibbee, supra,* 69 Cal.App.4th at p. 62.) Indeed, Anthony did not spend time in any other household from late October or early November of 2002 until his death on January 10, 2003. After plaintiff's arrest in the middle of November 2002, the Doyle household was the only place Anthony lived and the Doyles were his only caregivers. The Doyles' household was not merely " 'a place of infrequent and irregular visits[.]' " (*Ibid.*) Although the Doyles' household may not have been Anthony's "permanent residence," it was his residence prior to and at the time of his death.

Significantly, unlike *Gibson, Kibbee,* and *Underwood*, where the children had more than one possible residence, plaintiff presented no evidence that Anthony had any possible residence other than the Doyles' home when plaintiff and Joselyn were in jail. Although plaintiff asserts that Anthony could have stayed with his mother, Joyce, he presented no evidence to support this claim. Joyce never sought Anthony's return from the Doyles, and she did not testify that she would have taken care of Anthony had the Doyles returned him to her. Rather, she testified that she felt that plaintiff and Joselyn "could take care of that" after they were released from jail.

Contrary to plaintiff's claim, the determination of Anthony's residence does not turn on the subjective "wishes" of the parents. The *Gibson, Kibbee,* and *Underwood* cases all establish that the determination of a child's residence depends on objective

14

factors such as the amount of time spent in a particular household and the regularity and frequency of the child's visits to the household.

Nor does the record support plaintiff's claims that Anthony was "abduct[ed]" by the Doyles and that it would lead to "absurd results" if "kidnappers could abduct and hold a child" but not be insured for their negligence that results in the child's death. There is no evidence that this was a kidnapping or abduction. The undisputed evidence demonstrates that plaintiff explicitly agreed that the Doyles could take Anthony for the weekend and that he implicitly agreed to allow them to keep Anthony, since he did not demand Anthony's return or take any legal action to require the Doyles to return Anthony to him. Plaintiff even told the police, following Anthony's death, that it was "alright with him" that the Doyles had kept Anthony at their residence.

In sum, there is no triable issue of material fact as to whether Anthony was a resident of the Doyles' household at the time of his death within the meaning of the resident relative exclusion clause of Doyle's homeowner's insurance policy. Therefore, the trial court did not err by granting summary judgment as to plaintiff's claim that State Farm breached its contract by failing to provide insurance coverage for Anthony's death.

### D.    *Bad Faith Claim*

Plaintiff contends the trial court erred by granting summary judgment as to his claim that State Farm breached the implied covenant of good faith and fair dealing. He claims the "undisputed facts . . . show that State Farm denied coverage under the claim without fully investigating the facts surrounding Anthony's resident status." Plaintiff specifically faults State Farm for failing to interview himself, his mother, or Joselyn, and for relying on the Doyles' statements without obtaining any corroboration.

In response, State Farm contends that plaintiff does not have standing to bring a claim based on pre-judgment claim handling. State Farm relies on Insurance Code section 11580, subdivision (b)(2) which requires insurance policies contain "[a] provision that whenever judgment is secured against the insured or the executor or administrator of

15

a deceased insured in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." According to State Farm, pursuant to this statute, a judgment creditor's right to sue for breach of the implied covenant of good faith and fair dealing can only be based on an insurance company's bad faith withholding of payment following a judgment. (See generally *San Diego Housing Com. v. Industrial Indemnity Co.* (2002) 95 Cal.App.4th 669, 692 ["the judgment creditor can only enforce those covenants in the policy that were included for the benefit of the third party creditor"].)

We need not determine whether plaintiff lacked standing to bring a claim for breach of the implied covenant of good faith and fair dealing based on State Farm's prejudgment investigation. An insurer cannot be liable for bad faith if its coverage decision under the applicable polices is subsequently determined to be objectively reasonable. (*CalFarm Ins. Co. v. Krusiewicz* (2005) 131 Cal.App.4th 273, 277 (*Krusiewicz*).) Here, we have determined that the undisputed evidence established that Anthony was a resident of the Doyles' household at the time of his death, and that State Farm therefore reasonably denied coverage under the Doyles' insurance policy. Plaintiff has not shown that this determination would have changed if State Farm had done any additional or different investigation. At most, State Farm would have determined whether plaintiff and Joselyn wanted Anthony to reside somewhere other than with the Doyles while they were incarcerated. As explained above, such evidence of the parents' wishes or intent would not have been sufficient to overcome the objective facts establishing that Anthony actually resided with the Doyles.

Since State Farm's coverage decision was objectively reasonable, there is no triable issue of material fact concerning its alleged breach of the implied covenant of good faith and fair dealing. (See *Krusiewicz, supra,* 131 Cal.App.4th at p. 277.)

16

## E. *Punitive Damages*

Finally, plaintiff contends the trial court erred by granting summary judgment as to his claim for punitive damages. He contends "[a] review of the whole record demonstrates the consistent egregious conduct of State Farm in an attempt to vex, injure or annoy, with a conscious disregard for [plaintiff's] rights by refusing to acknowledge that Anthony could not have possibly been a resident of the Doyles' household [as] they did not have legal custody of Anthony."

As explained above, numerous cases have held that a legal custody order is not a prerequisite for a finding that a child is a resident of a particular household. (E.g., *Gibson, supra,* 211 Cal.App.3d at p. 182; *Kibbee, supra,* 69 Cal.App.4th at pp. 55, 63.) Thus, the fact that Doyles did not have legal custody of Anthony does not show that State Farm's determination of Anthony's residence was made with a conscious disregard for plaintiff's rights. Nor was there any other evidence that State Farm acted with malice, oppression, or fraud so as to justify an award of punitive damages. (See Civ. Code, § 3294; *Silberg v. California Life Ins. Co.* (1974) 11 Cal.3d 452, 462.) Thus, the trial court did not err by granting summary judgment as to plaintiff's claim for punitive damages.

## IV. DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.